

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

```
UNITED STATES OF AMERICA,              No. CR 04-30061-AA

        Plaintiff,                     OPINION AND ORDER

    v.

JEFFREY ALLEN DAVIS, CYNTHIA
DAVIS, RICHARD ORLAND DAVIS,
and KYLE JOHN BLONDIN,

        Defendants.
```
_____

Douglas W. Fong
Assistant United States Attorney
310 W. 6th Street
Medford, OR  97501
    Attorney for plaintiff

Donnal S. Mixon
Assistant Federal Public Defender
15 Newtown Street
Medford, OR  97501
    Attorney for defendant Jeffrey Allen Davis

David M. Orf
900 W. 8th Street
Medford, OR  97501
    Attorney for defendant Cynthia Davis

1    - OPINION AND ORDER

Vance M. Waliser
219 S. Holly Street
Medford, OR  97501
    Attorney for defendant Richard Orland Davis

Richard B. Thierolf
Jacobson, Thierolf & Dickey, P.C.
Two North Oakdale Avenue
Medford, OR  97501
    Attorney for defendant Kyle John Blondin

AIKEN, Judge:

Defendant Jeffrey Davis moves to suppress all evidence seized and statements obtained as a result of a search warrant executed at his residence on October 22, 2004.  Jeffrey Davis argues that the search violated the Fourth Amendment, because the search warrant was based on information obtained during an illegal and warrantless search of the curtilage surrounding his residence.  Defendants Richard Davis, Cynthia Davis, and Kyle Blondin join in Jeffrey Davis's motion to suppress.  Additionally, Richard Davis moves for suppression of statements and evidence obtained during an alleged custodial interrogation and unlawful search of his vehicle.

On April 14 and 24, 2006, the court held an evidentiary hearing and heard testimony from several witnesses.  Upon review of the evidence and arguments presented, defendants' motions to suppress are denied.

## I.   FACTS

Defendant Jeffrey Davis resides on a parcel of rural property located at 2010 Stewart Road in Grants Pass, Oregon, with his wife, defendant Cynthia Davis, daughter Heather Davis, and his daughter's

2    - OPINION AND ORDER

boyfriend, defendant Kyle Blondin.  The property consists of eighty wooded acres and is bordered by Bureau of Land Management (BLM) property to the east and west, private property to the north, and property held in Cynthia Davis's name to the south.  The residence is located in a cleared area slightly west of the center of the property.  See Government's Response to Defendants' Motion to Suppress, Exs. 1 and 2.  A pond is located approximately 120 feet southeast of the residence, and a shop area enclosed by chain-link fencing is located approximately 115 feet east of the residence, with the shop over 180 feet from the residence.  Government's Response, Ex. 3.  The Davis property is accessed via a shared gravel road that extends from Stewart Road to the Ruth Hyde Girl Scout Camp (located south of the BLM property on the west side of 2010 Stewart Road), the Davis properties, and the private properties to the north.  See Government's Response, Ex. 1.

During 2004, Detective Pete Jenista, a member of the Josephine County Interagency Narcotics Team (JOINT), received information from a confidential informant that a marijuana grow was being cultivated at 2010 Stewart Road.  He began an investigation into the property and discovered that it belonged to defendants Jeffrey and Cynthia Davis.

On October 12, 2004, at approximately 9:30 p.m., Jenista, along with Detectives Michael Vorberg and Sean Valdez, conducted an inspection of 2010 Stewart Road.  They drove along Stewart Road to

3    - OPINION AND ORDER

the end of the pavement, then walked along the shared gravel road. After a short distance of approximately 100 yards, the detectives encountered a closed, mechanized gate across the gravel road just inside of property owned by the Girl Scouts of Winema Council (Girl Scouts).[1] A fence line extended from the east side of the gate but not the west, and a "No Trespassing" sign was posted on a piece of wood lying on the ground to the right of the gate. Government's Response, Exs. 5A, 5B, 5C, 9. However, the detectives did not see this sign in the darkness. Several parties possessed access codes to the mechanized gate, including the staff and volunteers of the Girl Scouts, Jeffrey and Cynthia Davis, Richard Davis, other property owners, the BLM, Pacific Power, and Oregon State Forestry. Government's Response, Ex. 4. Additionally, the Girl Scouts provide a programmed gate opener to Girl Scout troops and others who rent the property from them.

The detectives walked around the gate and continued on the gravel road - through Girl Scout and BLM property - towards Davis property located at 2010 Stewart Road. They walked approximately a half-mile when they saw the lights of the house and shop. From this vantage point, approximately 500 feet from defendant's house, Jenista and Vorberg heard the sound of a generator and detected an odor of growing marijuana. See Government's Response, Exs. 2, 9;

---

[1] Apparently, Jeffrey Davis donated the gate to the Girl Scouts an installed it in April 2003.

4   - OPINION AND ORDER

Defendant Jeffrey Davis's memorandum in Support of Search Warrant, Ex. B, Affidavit in Support of Search Warrant, p. 14.

The detectives then left the gravel road to the right and continued along a dirt skid road. They followed the skid road for a short distance through a cleared gravel area, eventually reaching another clearing near the southern most edge of the pond. From this area, the detectives were able to view the well-lit shop compound. The detectives entered the woods to the right of the skid road and walked through the trees and brush along the south and east sides of the pond, down to a gully on the east side of the shop compound. See generally, Government's Response, Exs. 2, 3 and 9. From an embankment below the shop, the detectives heard the humming sound of a generator. They also noticed steam or humidity rising from the shop, drifting in the direction where the detectives originally smelled marijuana.

The detectives walked up the embankment to the chain-link fence surrounding the shop area. Government's Response, Exs. 7C, 7D, 9. They observed that the shop area was enclosed by the chain-link fence and contained heavy equipment and vehicles. Walking north along the fenceline, the detectives observed a 12-inch diameter ventilation pipe protruding from the side of a steep, wooded embankment below the shop. Government's Response, Exs. 7H-7J, 9. The detectives felt warm air, smelled the odor of marijuana, and heard the sound of an exhaust fan coming from the

pipe. The detectives continued north of the shop area and observed a small outbuilding behind the shop. The sound of the generator was louder at this location, and Jenista believed that it came from the small outbuilding.

When the detectives returned to the gravel road, they again smelled the odor of marijuana.

Based on this information, Jenista obtained a search warrant for 2010 Stewart Road.

On October 22, 2004, at approximately 7:30 a.m., members of JOINT, the Drug Enforcement Agency (DEA), and the Josephine County Sheriff's Office executed the search warrant at 2010 Stewart Road. The search warrant authorized the search of all property located at 2010 Stewart Road, as well as "all other persons or occupants found to be keeping, visiting, or frequenting said premises" and "all other vehicles at the premises possessed by these persons or persons found to be keeping, visiting, or frequenting these premises." Defendant Jeffrey Davis' Memorandum in Support of Motion to Suppress, Ex. B, Search Warrant, pp. 1-2.

During the warrant's execution, co-defendant Richard Davis, Jeffrey's brother, drove his vehicle up the driveway to 2010 Stewart Road and parked east of the house. Richard exited his vehicle and approached Andrew Aguinaga and Eric Sarmento, reserve deputies with the Josephine County Sheriff's Office. Richard asked what was happening, and Aguinaga and Sarmento advised him that law

enforcement officers were executing a search warrant at the premises, and that Richard would need to speak with one of the detectives and have the search warrant read to him. Aguinaga asked Richard what his name was and why he was there, and Richard answered that he was visiting his brother, Jeffrey.

Aguinaga asked Richard to provide some identification, and as Richard accessed his vehicle to obtain his wallet, Aguinaga asked Richard to move his vehicle from the driveway. Richard moved his truck to another location and returned to Aguinaga with his identification.

Aguinaga and Sarmento contacted Sergeant Selig and informed him that Richard had entered the search warrant area. As the reserve deputies stood about ten or fifteen feet away, Selig read the search warrant to Richard and informed him of its purpose. At some point, Richard was patted down for weapons by reserve deputies, and a tin of hashish oil was found in Richard's pocket. During this encounter, Sergeant Selig found Richard to be pleasant and cooperative.

DEA Agent Ron Wright was notified that Richard had arrived and that Wright should speak with him. Selig introduced Wright to Richard, and Wright obtained Richard's identification and copied down the information. In response to questions regarding his identity, Richard stated that he was Jeffrey's brother, that he rented a home from Jeffrey at 10511 Lower River Road, and that he

7    - OPINION AND ORDER

operated a muffler shop previously owned by Jeffrey. Agent Wright asked Richard what he knew about the activities in the shop, and Richard dropped his head and responded, "Everything." Richard acknowledged that he helped with the marijuana grow operation, and then stated that he should talk to a lawyer.

Richard was then handcuffed and escorted into the house. Officers searched his pickup truck and found a bank pouch containing a loaded handgun and $4,840, and another loaded handgun on the floor. Based on this information, officers obtained a search warrant for property occupied by Richard Davis located at 10511 and 10517 Lower River Road. As a result of the searches at 2010 Stewart Road and the Lower River Road properties, law enforcement authorities seized substantial evidence of marijuana manufacturing and trafficking and firearm violations.

## II. DISCUSSION

### A. Detectives Did Not Enter Curtilage of the Davis Home

Defendants argue that Detectives Jenista, Vorberg and Valdez conducted a warrantless search of the curtilage surrounding the Davis home in violation of their rights under the Fourth Amendment. Absent the information gleaned from entry onto the curtilage, defendants contend that the search warrant lacked probable cause that evidence of marijuana manufacturing would be found at 2010 Stewart Road.

To prevail on a motion to suppress challenging the

constitutionality of a search, a defendant must establish a personal and "legitimate expectation of privacy in the place searched." United States v. Davis, 332 F.3d 1163, 1167 (9th Cir. 2003) (internal quotation marks and citation omitted).[2] While the Fourth Amendment recognizes a legitimate expectation of privacy in the home, the zone of protection does not extend to "open fields" beyond the boundary of the home's curtilage - the area "immediately surrounding and associated with the home." Oliver v. United States, 466 U.S. 170, 180 (1984). "[O]bservations made by officers while they are not within the curtilage of a house do not constitute an unreasonable search under the Fourth Amendment." United States v. Traynor, 990 F.2d 1153, 1157 (9th Cir. 1993). Consequently, the open fields doctrine allows a search of what is in plain view, because "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." United States v. Dunn, 480 U.S. 294, 304 (1987).

To assist courts in determining whether an area is curtilage or unprotected open fields, the Supreme Court has identified four factors to consider: 1) "the proximity of the area claimed to be curtilage to the home"; 2) "whether the area is included within an

---

[2]The government argues that Richard Davis possesses no reasonable expectation of privacy in his brother's house and shop, and therefore cannot contest the validity of the search. However, because the search warrant was supported by probable cause, I find this issue moot.

9    - OPINION AND ORDER

enclosure surrounding the home"; 3) "the nature of the uses to which the area is put"; and 4) "the steps taken by the resident to protect the area from observation by people passing by." Dunn, 480 U.S. at 301. "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration - whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.

As an initial matter, defendants do not and cannot claim a legitimate privacy interest in the shared gravel road leading to the driveway at 2010 Stewart Road. Along with defendants, the Girl Scouts, the BLM, Pacific Power, Oregon State Forestry, and other property owners had passcodes to open the mechanized gate located on Girl Scout property, and all apparently used the gravel road to access properties along the road. United States v. Roberts, 747 F.2d 537, 541-42 (9th Cir. 1984) (find that "no trespassing signs were not sufficient to turn an unobstructed private road into an area for protected intimate activities").

Thus, the question is whether detectives entered the curtilage of the Davis residence when they walked along skid roads to the fence line surrounding the shop area.

In Dunn, the Supreme Court found that "no constitutional violation" occurred where officers "crossed over respondent's ranch-style perimeter fence, and over several similarly constructed

10   - OPINION AND ORDER

interior fences, prior to stopping at the locked front gate of the barn." Dunn, 480 U.S. at 304. The Court reasoned:

> [T]he officers never entered the barn, nor did they enter any other structure on respondent's premises. Once at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front. And, standing as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn.

Id. Consideration of the four Dunn factors in this case compels the same result.

First, the detectives were over 250 feet from the residence when they observed the ventilation pipe below the shop area, and the shop itself was approximately 182 feet from the house. See Government's Response, Ex. 3. In Dunn, the Supreme Court noted that the "substantial distance" of fifty or sixty yards from the barn to the house "supports no inference that the barn should be treated as an adjunct of the house." Dunn, 480 U.S. at 302. Although I recognize that the extent of curtilage on rural properties is greater than in urban settings, "it is rare for curtilage to extend more than 100 feet beyond the home." United States v. Dellas, 355 F. Supp. 2d 1095, 1103 (N.D. Cal. 2005) (citing cases).

Second, no fencing surrounds the house and shop to clearly demarcate the shop area as curtilage. Dunn, 480 U.S. at 302 ("It is also significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence.").

11 - OPINION AND ORDER

Defendants nevertheless maintain that the woods and rough terrain bordering the house, pond, and shop area served as a natural enclosure indicating the boundaries of the curtilage. See United States v. Johnson, 256 F.3d 895, 902 (9th Cir. 2001) (en banc) ("[N]atural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.'") (quoting Dunn, 480 U.S. at 302). However, the chain-link fence surrounding the shop effectively segregated it from the house. See United States v. Van Damme, 48 F.3d 461, 464 (9th Cir. 1995) ("The board fence surrounding the greenhouse made it a distinct portion of the property quite separate from the house."); Traynor, 990 F.2d at 1158.

Moreover, even if the wooded area could be considered a "natural boundary" defining the curtilage of the house, the detectives did not observe incriminating evidence from inside this boundary. Rather, the detectives observed the shop area and the ventilation pipe from the wooded embankment below and outside of the shop area. "An open field need be neither 'open' nor a 'field'" and "may include any unoccupied or undeveloped area outside the curtilage" Oliver, 466 U.S. at 180 n.11 ("For example, . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment."). Therefore, the fact that the detectives made their observations from a wooded location outside any fencing surrounding the house or

12   - OPINION AND ORDER

shop supports the finding that they were in open fields outside the curtilage. <u>Van Damme</u>, 48 F.3d at 464 (upholding search of greenhouses where officers trespassed on defendant's land, walked through defendant's forest, climbed over defendant's wire perimeter fence, and looked through a crack in the twelve-foot high board fence surrounding the greenhouses; "[t]he officers were not within the curtilage when they saw the marijuana through the fence and greenhouse doors, and neither were the greenhouses").

Third, the detectives' observations would not have suggested that the shop or the surrounding area were used for household-related purposes. The shop was enclosed by a chain-link fence and contained industrial equipment, vehicles and heavy machinery. Government's Response, Exs. 6D, 7A-7G. As in <u>Dunn</u>, the detectives detected smells and sounds associated with marijuana manufacturing as they approached the fence surrounding the shop. <u>See</u> <u>Dunn</u>, 480 U.S. at 302 ("It is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home."). Although Jeffrey testified that personal belongings and foodstuffs were stored in the shop and that it was the site for occasional barbeques, the officers' observations of illicit activity support the finding that the shop's use was primarily for the manufacture of marijuana, and that it was not closely associated with activities of the home. <u>Traynor</u>, 990 F.2d at 1158.

shop supports the finding that they were in open fields outside the curtilage. <u>Van Damme</u>, 48 F.3d at 464 (upholding search of greenhouses where officers trespassed on defendant's land, walked through defendant's forest, climbed over defendant's wire perimeter fence, and looked through a crack in the twelve-foot high board fence surrounding the greenhouses; "[t]he officers were not within the curtilage when they saw the marijuana through the fence and greenhouse doors, and neither were the greenhouses").

Third, the detectives' observations would not have suggested that the shop or the surrounding area were used for household-related purposes. The shop was enclosed by a chain-link fence and contained industrial equipment, vehicles and heavy machinery. Government's Response, Exs. 6D, 7A-7G. As in <u>Dunn</u>, the detectives detected smells and sounds associated with marijuana manufacturing as they approached the fence surrounding the shop. <u>See</u> <u>Dunn</u>, 480 U.S. at 302 ("It is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home."). Although Jeffrey testified that personal belongings and foodstuffs were stored in the shop and that it was the site for occasional barbeques, the officers' observations of illicit activity support the finding that the shop's use was primarily for the manufacture of marijuana, and that it was not closely associated with activities of the home. <u>Traynor</u>, 990 F.2d at 1158.

shop supports the finding that they were in open fields outside the curtilage. Van Damme, 48 F.3d at 464 (upholding search of greenhouses where officers trespassed on defendant's land, walked through defendant's forest, climbed over defendant's wire perimeter fence, and looked through a crack in the twelve-foot high board fence surrounding the greenhouses; "[t]he officers were not within the curtilage when they saw the marijuana through the fence and greenhouse doors, and neither were the greenhouses").

Third, the detectives' observations would not have suggested that the shop or the surrounding area were used for household-related purposes. The shop was enclosed by a chain-link fence and contained industrial equipment, vehicles and heavy machinery. Government's Response, Exs. 6D, 7A-7G. As in Dunn, the detectives detected smells and sounds associated with marijuana manufacturing as they approached the fence surrounding the shop. See Dunn, 480 U.S. at 302 ("It is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home."). Although Jeffrey testified that personal belongings and foodstuffs were stored in the shop and that it was the site for occasional barbeques, the officers' observations of illicit activity support the finding that the shop's use was primarily for the manufacture of marijuana, and that it was not closely associated with activities of the home. Traynor, 990 F.2d at 1158.

shop supports the finding that they were in open fields outside the curtilage. Van Damme, 48 F.3d at 464 (upholding search of greenhouses where officers trespassed on defendant's land, walked through defendant's forest, climbed over defendant's wire perimeter fence, and looked through a crack in the twelve-foot high board fence surrounding the greenhouses; "[t]he officers were not within the curtilage when they saw the marijuana through the fence and greenhouse doors, and neither were the greenhouses").

Third, the detectives' observations would not have suggested that the shop or the surrounding area were used for household-related purposes. The shop was enclosed by a chain-link fence and contained industrial equipment, vehicles and heavy machinery. Government's Response, Exs. 6D, 7A-7G. As in Dunn, the detectives detected smells and sounds associated with marijuana manufacturing as they approached the fence surrounding the shop. See Dunn, 480 U.S. at 302 ("It is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home."). Although Jeffrey testified that personal belongings and foodstuffs were stored in the shop and that it was the site for occasional barbeques, the officers' observations of illicit activity support the finding that the shop's use was primarily for the manufacture of marijuana, and that it was not closely associated with activities of the home. Traynor, 990 F.2d at 1158.

Regardless, the detectives were not in the shop area when they discovered the ventilation pipe and smelled marijuana - they were on an undeveloped wooded embankment to the south. Thus, the detectives' observations "indicated . . . that the use to which the [area] was being put could not fairly be characterized as so associated with the activities and privacies of domestic life that the officers should have deemed the [area] as part of [the] home." Id. at 303.

Finally, while I recognize the remote and rural nature of the property effectively shields it from public view, Jeffrey took few steps to protect the shop area or the embankment below "from observation by those standing in open fields." Dunn, 480 U.S. at 303. Granted, Jeffrey testified that he relied on the heavily wooded area south of the house, pond, and shop to keep people out. At the same time, however, Jeffrey testified that he placed a string across one of the skid roads, because people kept driving onto the property. Defendant's Ex. 23. Jeffrey thus had knowledge that the skid road allowed access to the property despite the trees and heavy brush. I do not find that a string constitutes an affirmative step to protect the area from observation so as to support a legitimate expectation of privacy in the wooded area south of the shop compound. Dunn, 480 U.S. at 301, 303.

The fact that Jeffrey apparently posted five or six "No Trespassing" signs at several locations does not alter my analysis.

14   - OPINION AND ORDER

See Defendant Jeffrey Davis's Exs. 17-21, 35. "It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas." Oliver, 466 U.S. at 179. This is especially true here where the "No Trespassing" signs were few and far between, with several missing or torn and lying on the ground among leaves and pine needles. See Defendant's Exs. 8-11, 18-22, 30-32. Further, an investigator for the Federal Public Defender's Office testified that the signs were difficult to locate without directions, and only one was posted near the shop area. Therefore, under these circumstances, the mere presence of "No Trespassing" signs does not transform the area surrounding the shop into an area where an expectation of privacy was necessarily reasonable. Traynor, 990 F.2d at 1159. "[I]n the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." Oliver, 466 U.S. at 183-84. Thus, such signs fail to demonstrate "that the expectation of privacy was legitimate in the sense required by the Fourth Amendment." Id. at 182.

In sum, consideration of the four Dunn factors and the specific facts of this case leads to the conclusion that no entry onto the curtilage occurred. Rather, Detectives Jenista, Vorberg, and Valdez walked along a common gravel road and ungated dirt skid roads, through a wooded area south of the pond and shop, to a grassy embankment outside of the shop area and more than 200 feet

15   - OPINION AND ORDER

away from the Davis residence. There, from unprotected, unoccupied, undeveloped "open fields" outside the curtilage, they observed the ventilation pipe located outside the fenced shop area and detected the odor of marijuana.

Accordingly, I find that the detectives did not conduct a warrantless search of the curtilage of the Davis home.

B. Richard Davis Was Not Interrogated While "In Custody"

Richard argues that his statements to Agent Wright must be suppressed, because they were obtained in violation of his right against self-incrimination. Richard maintains that he was in custody when Wright questioned him regarding activities in the shop, and that no law enforcement officer had administered the requisite Miranda warnings. The government contends that Agent Wright's questioning of Richard was akin to a Terry-type encounter, and that police officers executing a search warrant need not give Miranda warnings to an individual briefly detained and questioned during the search. See Terry v. Ohio, 392 U.S. 1, 29 (1968) (permitting brief detention and search if "reasonably related in scope to the justification for their initiation"). I agree.

A law enforcement officer is obligated to administer Miranda warnings when a person's freedom is so restricted as to render the person "in custody." Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam). "Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of

movement of the degree associated with a formal arrest." United States v. Crawford, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal quotation marks and citations omitted), cert. denied, 543 U.S. 1057 (2005). Factors the court must consider include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). Thus, "[t]he inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002).

Here, Richard voluntarily drove up the driveway at 2010 Stewart Road during the execution of the search warrant and asked reserve deputies what was happening. Reserve deputies asked for identification, directed Richard to Sergeant Selig, and conducted a brief frisk after the search warrant was read - reasonable and necessary procedures to secure the premises during the search, particularly in light of the scope of the marijuana growing operation. See Muehler v. Mena, 544 U.S. 93, 98-100 (2005) (detaining occupant of premises to be searched in handcuffs for two to three hours during execution of search warrant did not violate Fourth Amendment); Michigan v. Summers, 452 U.S. 692, 702-03 (1981)

17   - OPINION AND ORDER

(the detention of an individual at his home during the execution of a search warrant did not constitute a unreasonable seizure under the Fourth Amendment; "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.").

Further, although Richard was detained briefly, I do not find that he was "in custody" for purposes of <u>Miranda</u> when initially questioned by Wright. After Wright contacted Richard, he asked a few brief questions regarding Richard's living and employment situation before asking whether Richard knew about the activities in the shop. Wright did not confront Richard with evidence of marijuana manufacturing, and no officer confined Richard or overtly restricted his movement. <u>Kim</u>, 292 F.3d at 975-77 (defendant's detention during the execution of a search warrant constituted a custodial interrogation when officers locked the doors to the premises and conducted a "full-fledged interrogation" for approximately one hour). Finally, Richard testified at the evidentiary hearing that the questioning was brief and informal, and that he was treated politely and professionally.

Thus, I find that the scope of questioning by Wright did not go beyond a brief <u>Terry</u>-type inquiry reasonably related to the search. <u>Id.</u> at 976; <u>see also</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984) (during a brief <u>Terry</u> detention, officers may ask "a moderate number of questions to determine [a person's] identity and

18   - OPINION AND ORDER

to try to obtain information confirming or dispelling the officer's suspicions."). Accordingly, I do not find that Richard's detention was unreasonable, and the encounter did not constitute a custodial interrogation that triggered the right to receive <u>Miranda</u> warnings.

C.  <u>The Search of the Vehicle Was Supported by Probable Cause</u>

Richard also argues that the evidence seized from his vehicle must be suppressed, because the search warrant authorizing the search of all vehicles "visiting or frequenting" the property was facially overbroad. However, a search warrant authorizing the search of property, including vehicles belonging to or used by persons residing on the property, is proper and does not limit the search to vehicles of permanent residents. <u>United States v. Motz</u>, 936 F.2d 1021, 1025 (9th Cir. 1991) (upholding search of vehicle where agents had reason to believe owner was involved in the conspiracy and was temporarily residing at property to be searched). Although Richard did not reside at the premises, he identified himself as Jeffrey's brother and stated that he was visiting his brother. Moreover, the warrant was not "so facially overbroad as to preclude reasonable reliance by the executing officers." <u>United States v. Michaelian</u>, 803 F.2d 1042, 1046 (9th Cir. 1986); see <u>United States v. Leon</u>, 468 U.S. 897 (1984).

Regardless, Richard's statements to Wright and the discovery of hashish oil found on his person provided officers with probable cause that evidence of marijuana manufacturing would be found in

19   - OPINION AND ORDER

Richard's pickup truck. See <u>California v. Acevedo</u>, 500 U.S. 565, 580 (1991). Thus, the search of Richard's vehicle did not violate the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, defendants' Motions to Suppress (docs. 45, 55) are DENIED.

IT IS SO ORDERED.

Dated this 24 day of May, 2006.

*[signature]*
Ann Aiken
United States District Judge

20   - OPINION AND ORDER